United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC,

Plaintiff,

v.

PBF ENERGY LIMITED, et al.,

Defendants.

Case No. 24-cv-07855-LB

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

Re: ECF Nos. 34, 41

## INTRODUCTION

The plaintiff, EDEN Environmental Citizen's Group, LLC, an environmental organization, sued the owner and operator of a petroleum refinery in Martinez, California, Martinez Refining Company LLC (MRC), and two affiliated companies, PBF Energy Limited and PBF Energy Western Region LLC. It claims that the refinery violates the conditions of its NPDES permit (claims one through seven, under the Clean Water Act's citizen-suit provision, 33 U.S.C. § 1365), that spent catalyst and coke solids deposited on and around the refinery after a November 2022 release may present an imminent and substantial endangerment (claim eight, under RCRA, 42 U.S.C. § 6972(a)(1)(B)), and that the same conduct violates California's Unfair Competition Law

United States District Court
Northern District of California

(claim nine).[1] The claims center on two things: (1) an event on November 24–25, 2022, when up to 20 to 24 tons of spent catalyst and metal-bearing particulate allegedly escaped the refinery's exhaust train and settled on refinery surfaces, surrounding soils, and stormwater conveyances, where residual solids allegedly remain and are remobilized by rain and wind; and (2) effluent-limit exceedances for total suspended solids (TSS) and nickel at the refinery's main outfall, Discharge Point 001, through July 2023, which the San Francisco Bay Regional Water Quality Control Board (Water Board) later resolved by an administrative order assessing a penalty.

The defendants move to dismiss the SAC under Rules 12(b)(1), 12(b)(4), and 12(b)(6) on seven grounds: (1) the CWA and RCRA claims are air-emissions claims that can be brought only under the Clean Air Act (CAA); (2) the UCL claim has no viable predicate; (3) the CWA penalty claims are barred by prior state prosecution, and the SAC alleges no TSS exceedance; (4) the plaintiff did not give pre-suit notice; (5) the plaintiff lacks standing; (6) the PBF entities did not operate the refinery; and (7) the plaintiff served an unsigned summons and the wrong complaint. The reply adds that, given the plaintiff's concessions in its opposition, the SAC alleges no unresolved effluent-limit exceedance and no plausible likelihood of recurrence under *Gwaltney*.[2]

The court grants the motion in part and denies it in part.

First, the court takes judicial notice of the defendants' exhibits for their existence, dates, parties, terms, and legal effect, and not for the truth of disputed statements in them. Exhibit A is a Chevron settlement about a different refinery and establishes nothing about MRC.

Second, the plaintiff has associational standing through its member Aiden Sanchez.

Third, the motion is denied to the extent it contends that the CWA and RCRA claims are air-emissions claims in disguise. The SAC disclaims stack emissions as CWA discharges or RCRA disposal. The point sources it pleads are the refinery's permitted outfalls and conveyance system, and a point source need not originate the pollutant it conveys. The defendants identify no CAA

---

[1] Second Am. Compl. (SAC) – ECF No. 28 at 36–42 (¶¶ 127–54). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 34; Opp'n – ECF No. 38; Reply – ECF No. 40; Defs.' Req. for Judicial Notice (RJN) – ECF No. 34-7; Pl.'s Limited Opp'n to RJN – ECF No. 39.

requirement that conflicts with the permit's stormwater duties or with RCRA's waste-handling provisions. The court agrees that it cannot regulate air emissions under the CWA, but any injunction will be tailored to proven permit violations, and the breadth of a prayer for relief is not a ground for dismissing a claim.

Fourth, as to the CWA claims: claim seven (the Attachment S stormwater duties) is plausibly pleaded and survives, and claims one through three survive to the extent they rest on the same stormwater-source conditions. Claim six (the Table 2 effluent limits) is dismissed with leave to amend: every exceedance in the SAC's schedule either was resolved by a Water Board order (so that civil penalties are barred, as the plaintiff concedes) or is a Table 3 reading that the plaintiff concedes is not a violation, and the allegation that violations are reasonably likely to recur is conclusory. (This is the closest question in the motion.) Claims four (bypass) and five (reporting) are dismissed with leave to amend. The theories that exceedances of Basin Plan objectives or California Toxics Rule criteria violate the permit are dismissed on the plaintiff's concession.

Fifth, claim eight (RCRA) survives. *Center for Community Action & Environmental Justice v. BNSF Railway Co.* forecloses treating an emission into the air as "disposal"; it does not foreclose a claim that MRC contributed to the handling and transportation of catalyst solids after they settled on land, and the SAC plausibly alleges a present endangerment. (This too is close.)

Sixth, claim nine (UCL) survives under the unlawful prong because the CWA and RCRA predicates survive and because the Fish and Game Code's allocation of civil-penalty enforcement to public prosecutors does not bar a UCL claim predicated on § 5650. The unfair-prong theory is dismissed as abandoned.

Seventh, the CWA's prior-prosecution bar, 33 U.S.C. § 1319(g)(6), forecloses civil penalties for the violations enumerated in the two Water Board orders (penalties the plaintiff does not seek) and nothing more. The notice argument fails because the SAC pleads June 2024 and July 2025 notices that the motion does not address. The claims against PBF Energy Limited and PBF Energy Western Region LLC are dismissed with leave to amend because the SAC pleads only the conclusion of operational control. The service objection is denied: the plaintiff served a signed

summons and the SAC on September 3, 2026, and the court extends the Rule 4(m) deadline to that date.

The plaintiff may file a third amended complaint within fourteen days.

## STATEMENT

### 1. The Refinery and Its Permits

MRC owns and operates the Martinez refinery.[3] Its wastewater and stormwater discharges are governed by NPDES Permit No. CA0005789, Order R2-2022-0034 (the Facility Order), issued by the Water Board and effective January 1, 2023.[4] The Facility Order authorizes the discharge of treated process wastewater and stormwater through Discharge Point 001 to the Carquinez Strait and of stormwater through Discharge Points 002, 004, 005, 007, and 008 to Peyton Slough and Peyton Creek.[5] Table 2 sets effluent limits at Discharge Point 001, including TSS mass limits of 1,500 pounds per day (average monthly) and 2,300 pounds per day (maximum daily) and total-recoverable-nickel limits of 43 and 72 micrograms per liter.[6] Table 3 supplies figures used to calculate additional allowable TSS mass when contaminated runoff is commingled with process wastewater. The parties now agree that those figures are not limits that can be exceeded.[7]

Attachment D contains standard conditions, including the duty to comply (§ 1.1.1), the duty to take reasonable steps to minimize or prevent any discharge in violation of the order that has a reasonable likelihood of adversely affecting human health or the environment (§ 1.3), the duty to properly operate and maintain facilities and systems of treatment and control (§ 1.4), a prohibition

---

[3] SAC – ECF No. 28 at 8–9 (¶¶ 17–18, 20).

[4] Facility Order, Ex. 1 to Durango Decl. – ECF No. 34-2 at 2; SAC – ECF No. 28 at 5 (¶ 5), 8 (¶¶ 17–18). The SAC pleads the permit's terms throughout, and the parties agree that the court may consider it. Opp'n – ECF No. 38 at 9; Pl.'s Limited Opp'n to RJN – ECF No. 39 at 19.

[5] Facility Order, Ex. 1 to Durango Decl. – ECF No. 34-2 at 2 (Table 1), 5 (§ 2); Opp'n – ECF No. 38 at 8.

[6] Facility Order, Ex. 1 to Durango Decl. – ECF No. 34-2 at 6–7 (§ 4.1.1 & Table 2); Opp'n – ECF No. 38 at 19; Reply – ECF No. 40 at 9.

[7] Facility Order, Ex. 1 to Durango Decl. – ECF No. 34-2 at 8 (§ 4.1.5 & Table 3); Opp'n – ECF No. 38 at 20; Reply – ECF No. 40 at 10.

on bypass, defined as the "intentional diversion of waste streams from any portion of a treatment facility" (§ 1.7), and reporting duties (§§ 5.5, 5.7, 5.8).[8] Attachment S requires a stormwater pollution prevention plan (SWPPP) and best management practices (BMPs) for the stormwater outfalls, including (1) identification and assessment of particulate sources, stormwater exposure, and pathways, (2) feasible housekeeping, cleanup, and containment measures, (3) monthly visual observations and sampling-event observations, (4) records, (5) BMP revision when observations show that sources are inadequately addressed, and (6) an annual compliance evaluation. The Facility Order required an updated SWPPP by October 1, 2023, and provides that MRC "shall comply with the requirements of Provision 6.3.4.3 as narrative effluent limitations."[9] The refinery's air emissions, including flaring, are regulated under a Title V permit issued by the Bay Area Air Quality Management District (Air District).[10]

**2. The Prior Enforcement Actions**

The Water Board twice resolved effluent-limit exceedances at Discharge Point 001. Order R2-2021-1007 resolved seven TSS violations in March 2020.[11] Order R2-2024-1041, entered October 30, 2024, resolved twenty-five enumerated effluent-limit exceedances during four periods ending on July 25, 2023, three unauthorized discharges (on October 27, 2022, January 4, 2023, and June 7, 2023), and one late report. It (1) assessed a penalty under Water Code § 13385, (2) recites that MRC did not dispute the occurrence of the discharges but settled "without administrative or civil adjudication of any issue of fact or law" and is a "final and binding resolution and settlement of the alleged violations contained in section II"; and (3) provides that compliance with the order "is not a substitute for compliance with applicable laws and regulations, and that continuing

---

[8] Facility Order, Ex. 1 to Durango Decl. – ECF No. 34-2 at 34–43 (Attachment D §§ 1.1.1, 1.3, 1.4, 1.7.1.1, 5.5, 5.7–5.8); Mot. – ECF No. 34 at 26; Opp'n – ECF No. 38 at 17–19.

[9] Facility Order, Ex. 1 to Durango Decl. – ECF No. 34-2 at 6–18 (§§ 4.2.3, 6.1.3, 6.3.4.3), 146–54 (Attachment S §§ 1.1, 1.4.3–1.4.4, 1.5–1.6, 1.9, 2.1–2.4), as characterized in Opp'n – ECF No. 38 at 8, 14–15.

[10] Title V Permit, Ex. 2 to Durango Decl. – ECF No. 34-3.

[11] Order R2-2021-1007, Ex. F to RJN – ECF No. 34-13 at 2–13.

violations of the type alleged herein may subject [MRC] to further enforcement."[12] The penalty analysis attached to the order states that MRC "was able to identify and eventually resolve ongoing treatment problems."[13]

On the air side, MRC and the Air District settled Notice of Violation 58114 by an agreement (dated December 23, 2025) that requires enhanced fenceline monitoring; MRC denied the allegations.[14] On February 18, 2026, the Contra Costa County Superior Court entered a stipulated judgment in *People v. Martinez Refining Co.*, No. C26-00490, an action by the District Attorney and the Air District under the Health and Safety Code, the Fish and Game Code, and the UCL concerning flaring and coke-dust releases from 2020 through January 2025. The judgment was (1) entered without adjudication or admission of liability, (2) resolves claims that were or could have been alleged in that complaint as to MRC and its affiliates through the date of entry, (3) precludes further penalties or administrative action by the District Attorney and the Air District for those "Covered Matters"; and (4) preserves enforcement for later or separate violations.[15] Exhibit A to the RJN, which the motion describes as a February 2024 settlement between MRC and the Air District, is a settlement between Chevron U.S.A. Inc. and the Air District about particulate emissions from Chevron's Richmond refinery. MRC appears in it only as the petitioner in a related proceeding.[16]

**3. The SAC**

The SAC alleges that (1) MRC generates, accumulates, moves, and stockpiles spent FCC catalyst, catalyst fines, and petroleum-coke solids as an operational matter, (2) on November 24–

---

[12] Order R2-2024-1041, Ex. G to RJN – ECF No. 34-14 at 2–4 (§ II ¶¶ 3, 5), 9–10 (§ III ¶¶ 6, 9).

[13] *Id.* at 22 (Attachment A at A6).

[14] Settlement Agreement, Ex. B to RJN – ECF No. 34-9 at 2–3 (¶¶ 2–3).

[15] Compl., Ex. C to RJN – ECF No. 34-10 at 4–5 (¶¶ 10–16), 8 (¶ 34); Final Judgment, Ex. E to RJN – ECF No. 34-12 at 3–6 (¶¶ 1, 11–13, 15, 19), 8–10 (¶¶ 27–28, 32).

[16] Ex. A to RJN – ECF No. 34-8 at 2–4; Pl.'s Limited Opp'n to RJN – ECF No. 39 at 5; Mot. – ECF No. 34 at 14. The reply concedes the error and attaches a different agreement. Reply – ECF No. 40 at 5 n.1; Ex. A to *id.* – ECF No. 40-1.

25, 2022, it mishandled those materials so that up to 20 to 24 tons of spent catalyst and metal-bearing particulate (containing elevated aluminum, barium, chromium, nickel, vanadium, and zinc) escaped containment through the CO-boiler exhaust train and were deposited across facility surfaces, surrounding soils, and stormwater conveyances, (3) response crews collected, handled, and hauled released material during cleanup, and (4) residual coke and catalyst solids remained at filing in conveyances, soils, and sediments, where they persist, migrate, and are remobilized by rain, washdown, tracking, wind, and stormwater flow.[17] It alleges visible discoloration and suspended solids in surface runoff in January 2023 and February 2024, and failures to sample, report, and revise the SWPPP in response.[18] It pleads the 2022 release as evidence of a TSS-bearing source and of the need for injunctive relief, not as the cause of any identified Discharge Point 001 exceedance, and expressly "does not allege that any particular aerial release caused any particular effluent exceedance at Discharge Point 001."[19] It disclaims treating stack emissions alone as a CWA point-source discharge or as RCRA disposal and identifies the permitted outfalls and the refinery's storm drains, ditches, pipes, channels, and other conveyances as the point sources.[20]

The SAC's schedule of Discharge Point 001 exceedances lists TSS mass and nickel concentration exceedances through July 2023, each annotated as resolved by a Water Board order, together with TSS concentration readings compared to the Table 3 figures.[21] It (1) pleads pre-2023 exceedances "as background and evidence of recurring conditions and the need for injunctive relief, and not as violations of R2-2022-0034," (2) disclaims civil penalties "for the same discharges or effluent exceedances resolved by Order R2-2024-1041 or any other Water Board

[17] SAC – ECF No. 28 at 12 (¶ 36), 19 (¶¶ 66, 68), 29 (¶ 95), 35–36 (¶¶ 122–26); Opp'n – ECF No. 38 at 6, 8, 21–22 (quoting ¶ 68). The motion places the release on "November 24–25, 2024"; that appears to be a typographical error, and the SAC, the opposition, and the reply all date it to November 2022. Mot. – ECF No. 34 at 21; Reply – ECF No. 40 at 7–8.

[18] SAC – ECF No. 28 at 27–28 (¶¶ 92, 98), 33–34 (¶¶ 113–17); Reply – ECF No. 40 at 19.

[19] SAC – ECF No. 28 at 12 (¶ 36), 29–30 (¶¶ 96–97); Reply – ECF No. 40 at 13 & n.11.

[20] SAC – ECF No. 28 at 10–11 (¶¶ 29–31), 19–20 (¶ 68), 36 (¶ 125), 41 (¶ 150).

[21] *Id.* at ¶ 23–25 (¶ 80); Reply – ECF No. 40 at 9–10.

administrative civil liability order," (3) seeks penalties only for exceedances "not barred by 33 U.S.C. § 1319(g)(6)," and (4) alleges that MRC discharged "under recurring conditions showing a reasonable likelihood of future violations."[22]

EDEN sues on behalf of its member, Aiden Sanchez, who alleges that (1) he hiked, recreated, and viewed scenery and wildlife near the receiving waters in March, April, May, and July 2024 and July 2025, (2) he associates visible particulate deposition and discoloration with the refinery's discharges, and (3) he curtailed those uses because of the alleged exceedances, releases, and recurring pollution risks.[23] In a supplemental declaration filed with the opposition, he states that he would resume those activities if the discharges and the deposited material he associates with them were abated.[24] EDEN also alleges that, before and independent of this litigation, it diverted staff time and money to investigate, sample, monitor, and test the alleged releases.[25]

The SAC alleges on information and belief that PBF Energy Western Region LLC "exercised, directed, or retained operational control over regional refining operations, maintenance, stormwater controls, waste handling, and environmental-compliance decisions affecting the Refinery," names PBF Energy Limited "only to the extent" it exercised comparable control, and limits each entity's liability to its own participation in, control of, or failure to correct the operations and compliance practices at issue.[26] PBF Energy Inc.'s Form 10-K lists PBF Energy Limited as a British Columbia subsidiary and lists MRC and PBF Energy Western Region LLC as Delaware subsidiaries.[27]

---

[22] SAC – ECF No. 28 at 4–5 (¶¶ 3, 5), 23–25 (¶¶ 79–80), 30 (¶ 97), 40 (¶ 144); Reply – ECF No. 40 at 5 n.1, 11 n.6, 12.

[23] SAC – ECF No. 28 at 6–7 (¶¶ 9, 11–14); Sanchez Decl., Ex. A to *id.* at 45–46 (¶¶ 2, 4–7).

[24] Suppl. Sanchez Decl. – ECF No. 38-1 at 2–3 (¶ 5).

[25] SAC – ECF No. 28 at 21 (¶ 72).

[26] *Id.* at 7–9 (¶¶ 15–16, 20), as characterized in Opp'n – ECF No. 38 at 29 and Mot. – ECF No. 34 at 33–34.

[27] PBF Energy, Inc. Form 10-K, Ex. I to RJN – ECF No. 34-16 at 6. The original complaint and the SAC name PBF Energy Limited; the FAC named PBF Energy, Inc. Mot. – ECF No. 34 at 12 n.5, 33 n.35.

Claims one through seven allege violations of the Facility Order: (1) the duty to comply (Attachment D § 1.1.1); (2) the duty to mitigate (§ 1.3); (3) operation and maintenance (§ 1.4); (4) bypass (§ 3.3 and Attachment D § 1.7); (5) reporting (Attachment D §§ 5.5, 5.7–5.8); (6) the Table 2 effluent limits, with an allegation of recurring violations; and (7) the Attachment S SWPPP and BMP requirements. Claim eight is under RCRA § 6972(a)(1)(B). Claim nine is under the UCL's unlawful and unfair prongs, predicated on the CWA, RCRA, and Fish and Game Code § 5650.[28] EDEN seeks declaratory and injunctive relief (characterization and management of deposited solids, SWPPP and BMP revision, water-side inspection and monitoring, conveyance cleanup, and treatment-system reliability measures) and civil penalties for unbarred CWA violations.[29]

**4. Procedural History**

EDEN served a 60- and 90-day notice of intent to sue on June 10, 2024, filed this action on November 9, 2024, served a supplemental notice on July 30, 2025, and then filed the FAC.[30] The defendants moved to dismiss the FAC, and EDEN filed the SAC on June 30, 2026, with its opposition to that motion.[31] EDEN served a further notice letter on July 7, 2026.[32] The defendants filed this motion on August 7, 2026.[33] On September 3, 2026, EDEN served a signed summons and the SAC on CT Corporation, each defendant's registered agent, and filed proofs of service on September 8, 2026.[34]

---

[28] SAC – ECF No. 28 at 36–42 (¶¶ 127–54); Opp'n – ECF No. 38 at 14–26.

[29] SAC – ECF No. 28 at 42–43 (Prayer, ¶¶ 3–7); Opp'n – ECF No. 38 at 13–14.

[30] SAC – ECF No. 28 at 4–5 (¶¶ 2–3), 8 (¶ 19); Suppl. Sanchez Decl. – ECF No. 38-1 at 2 (¶¶ 3–4) & 4–56 (Exs. 1–2); Compl. – ECF No. 1; FAC – ECF No. 13.

[31] ECF Nos. 20, 28, 30. The defendants say that the SAC was filed without leave; EDEN says that the defendants stipulated to it. Mot. – ECF No. 34 at 18; Opp'n – ECF No. 38 at 30 (citing ECF Nos. 25, 32). In any event, the parties have treated the SAC as the operative pleading.

[32] July 7, 2026 Notice, Ex. 3 to Durango Decl. – ECF No. 34-4.

[33] The parties consented to magistrate-judge jurisdiction. Consents – ECF Nos. 5, 25. The court can decide the motion without oral argument. Civil L.R. 7-1(b).

[34] Proofs of Service – ECF No. 37; Opp'n – ECF No. 38 at 30.

United States District Court
Northern District of California

## LEGAL STANDARDS

### 1. Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, it must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The court accepts well-pleaded facts as true and draws reasonable inferences in the plaintiff's favor, but it does not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* (cleaned up). If the court dismisses a claim, it should give leave to amend unless amendment would be futile. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc).

### 2. Rule 12(b)(1)

A challenge to subject-matter jurisdiction may be facial or factual. In a facial attack, the challenger asserts that the allegations are insufficient on their face to invoke federal jurisdiction, and the court accepts the allegations as true and applies a standard like the Rule 12(b)(6) standard. In a factual attack, the challenger disputes the truth of the jurisdictional allegations with evidence, and the plaintiff must support jurisdiction with competent proof (but the court may not resolve genuinely disputed facts where the jurisdictional question is intertwined with the merits). *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014). The defendants invoke the factual-attack standard, but they submit no evidence contradicting Mr. Sanchez's allegations about his use of the receiving waters and instead argue that the allegations are insufficient. The challenge is facial, and the court takes the SAC's standing allegations, including Mr. Sanchez's declaration attached to it, as true.

### 3. Judicial Notice

A court may notice a fact "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Court records, administrative orders, SEC filings, and government websites are proper

subjects of notice, but "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001). A document is incorporated by reference when the complaint refers to it extensively or it forms the basis of a claim; even then, the court may not use it to resolve factual disputes against the plaintiff at the pleading stage. *Khoja*, 899 F.3d at 1002–03.

## ANALYSIS

### 1. Judicial Notice

The court takes judicial notice of RJN Exhibits B through I and Durango Declaration Exhibits 1 and 2 for their existence, dates, parties, terms, and legal effect: the alleged violations that each order or judgment resolves, the obligations it imposes, the persons it binds, and its express reservations. The court does not notice (and does not treat as established) the contested propositions the defendants draw from them: that regulators diligently prosecuted the conduct the SAC alleges, that the pleaded conditions were cured or abated, that EDEN is bound by the People's judgment, that any PBF entity did or did not control refinery operations, or that the Title V permit already requires the relief the SAC seeks. Those are merits questions, and public records cannot be used to answer them against the plaintiff on a motion to dismiss. *Khoja*, 899 F.3d at 999–1003; *Lee*, 250 F.3d at 689–90. The Facility Order and the Title V permit are also incorporated by reference, and the court considers their terms. The plaintiff does not oppose notice on these terms.[35]

Exhibit A is a settlement between Chevron and the Air District about Chevron's Richmond refinery. The court notices it for what it is; it says nothing about MRC's compliance. The defendants concede the error and attach the correct agreement to their reply, together with a declaration filed by a nonparty in *Inland Empire Waterkeeper v. Corona Clay Co.*, No. 8:18-cv-00333 DOC (DFM). The court does not consider either exhibit, both of which were submitted for

[35] Pl.'s Limited Opp'n to RJN – ECF No. 39 at 4–7, 20–21; Opp'n – ECF No. 38 at 9.

the first time on reply, and nothing in this order turns on them.[36] The reply also asserts, without record support, that the refinery has had no TSS or nickel exceedance since July 2023 and that it updated its SWPPP in 2025, and it argues for the first time that EDEN's June 2024 and July 2025 notices do not cover the "response crews" allegation in SAC ¶ 68. The court does not rely on the factual assertions and does not consider the new argument. *See* Parts 4.1, 4.2, and 8, below. That disposes of EDEN's objections to the reply evidence and its administrative motion for leave to file a sur-reply addressed to those three matters: the objections are overruled as moot, and the motion is denied as moot.[37]

**2. Standing**

An association has standing to sue on behalf of its members when at least one member would have standing in his own right, the interests at stake are germane to the organization's purpose, and neither the claim nor the relief requires the members' individual participation. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). A member has standing if he has suffered an injury in fact that is fairly traceable to the defendant's conduct and likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The defendants challenge only the first element, and only as to Mr. Sanchez.[38]

*Injury in fact.* Environmental plaintiffs "adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity. *Laidlaw*, 528 U.S. at 183 (cleaned up).

[36] Reply – ECF No. 40 at 5 n.1; Exs. A and B to *id.* – ECF Nos. 40-1, 40-2; *see* Civil L.R. 7-3(d). The reply also corrects the URL for Exhibit I; the filed excerpt is the PBF Energy Inc. Form 10-K, and the error is immaterial.

[37] Pl.'s Obj. to Reply Evidence – ECF No. 42; Pl.'s Admin. Mot. – ECF No. 41; Defs.' Opp'n – ECF No. 44. The motion asks, in the alternative, that the court not rely on the three matters without giving EDEN an opportunity to respond, and the proposed sur-reply asks that any notice defect result in dismissal without prejudice rather than with prejudice. Admin. Mot. – ECF No. 41 at 4; Proposed Sur-Reply, Ex. A to Sinha Decl. – ECF No. 41-1 at 7. The order does not rely on those matters and finds no notice defect, so the sur-reply would not change the result.

[38] Mot. – ECF No. 34 at 30–33; Reply – ECF No. 40 at 18–19.

Members' reasonable concerns about pollution that lead them to curtail their use of a waterway are enough; the plaintiff need not prove that the water is in fact degraded. *Id.* at 183–85; *Ecological Rts. Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1093–94 (9th Cir. 2017); *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149–51 (9th Cir. 2000). Mr. Sanchez alleges that (1) he hiked and viewed wildlife near the Carquinez Strait, Peyton Slough, and Peyton Creek in identified months before suit, (2) he associates visible particulate deposition and discoloration with the refinery's discharges, and (3) he curtailed those uses because of the alleged exceedances, releases, and recurring pollution risks. That is the *Laidlaw* showing. The defendants' contrary authority, *Central Valley Eden Environmental Defenders, LLC v. Airgas USA, LLC*, No. 2:24-cv-03547-DJC-AC, 2025 WL 1150920, at *4–5 (E.D. Cal. Apr. 18, 2025), rejected a bare recital of "aesthetic, recreational, and scientific" interests unattached to any identified member. The SAC identifies all three. The reply's timing argument (that Mr. Sanchez used the area only after the last resolved exceedance in July 2023, or else kept using it despite his distress) assumes that the only pollution he may reasonably fear is an adjudicated exceedance. The SAC alleges continuing stormwater discharges, residual solids in the conveyances, and visible discoloration in runoff as late as February 2024. A member who keeps using an area but does so less, or with diminished enjoyment, is injured. *Laidlaw*, 528 U.S. at 182–83; *Ecological Rts. Found.*, 874 F.3d at 1093.

*Traceability and redressability.* A CWA plaintiff need not pinpoint the origin of particular molecules; it must show that the defendant "discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000) (cleaned up). MRC is the permitted discharger to the waters Mr. Sanchez uses, and the SAC alleges that it discharges TSS and metals to them and that residual refinery solids migrate into them. That suffices at the pleading stage. The possibility of other contributors is a fact question that cannot be resolved against the plaintiff on the pleadings. *Id.* The vessel-access regulation the defendants cite, 33 C.F.R. § 334.1100, concerns a restricted area near the former Mare Island shipyard and does not bear on hiking along the Martinez shoreline. Redressability is satisfied by an allegation of a continuing violation or the imminence of a future violation, which injunctive relief would redress, and civil penalties redress

injury by deterring future violations. *Id.*; *Laidlaw*, 528 U.S. at 185–86. Mr. Sanchez's supplemental statement that he would resume his activities if the discharges and deposits were abated confirms the point (but is not necessary to it). The prior settlements do not change the analysis: they are not noticed for the truth of any claim of cure; none addresses the Attachment S duties or the deposited solids; and a defendant that argues its conduct has ceased bears the "formidable burden" of showing that it is absolutely clear the conduct could not reasonably be expected to recur, which cannot be carried on a motion to dismiss. *Laidlaw*, 528 U.S. at 189–90; *S.F. BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1159–60 (9th Cir. 2002).[39]

EDEN has associational standing. The other *Hunt* elements are not disputed.

### 3. The Air-Emissions Premise

The defendants' lead argument is that every claim rests on treating the refinery's stack and flare emissions as water discharges or waste disposal, so the claims can be brought only under the CAA. The SAC does not plead that theory. It disclaims stack emissions as CWA point-source discharges and as RCRA disposal, and it identifies as the point sources the refinery's permitted outfalls and the storm drains, ditches, pipes, channels, and treatment units that collect stormwater and convey it to those outfalls.[40]

That theory is sound as a matter of law. A "point source" is "any discernible, confined and discrete conveyance," 33 U.S.C. § 1362(14), and it "need not be the original source of the pollutant; it need only convey the pollutant to navigable waters." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004) (cleaned up). Stormwater runoff that is not collected or channeled is nonpoint-source pollution, which is why the runoff from utility poles in

[39] The defendants say that EDEN forfeited traceability for the RCRA claim by addressing only the CWA claims in its opposition. Reply – ECF No. 40 at 19. The same injury supports both: the RCRA claim alleges that residual metal-bearing solids migrate into the same waters Mr. Sanchez uses, and an order requiring their characterization and removal would redress his concern. The court also does not reach EDEN's argument that Mr. Sanchez suffers an independent informational injury from unreported discharges, *see Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 833–34 (9th Cir. 2021), because standing is established without it and the reporting claim is dismissed on other grounds.

[40] SAC – ECF No. 28 at 10–11 (¶¶ 29–31), 19–20 (¶ 68), 36 (¶ 125); Opp'n – ECF No. 38 at 13–14, 16–17.

*Ecological Rights Foundation v. Pacific Gas & Electric Co.*, 713 F.3d 502, 508–10 (9th Cir. 2013), was not actionable. But the same decision recognized that stormwater becomes a point-source discharge when it is collected and discharged through a discrete conveyance. *Id.* at 509–10. The Facility Order itself treats the refinery's outfalls as point sources and regulates the stormwater they discharge. And the Ninth Circuit has allowed a citizen suit alleging that petroleum coke blown by wind from uncovered piles into an adjoining slough was a CWA discharge. *Tosco*, 309 F.3d at 1159. *County of Maui v. Hawaii Wildlife Fund*, 590 U.S. 165, 183 (2020), which asks when a discharge that reaches navigable waters through groundwater is the "functional equivalent" of a direct discharge, has no application to a discharge from a permitted outfall. And *Chemical Weapons Working Group, Inc. v. United States Department of the Army*, 111 F.3d 1485, 1490–91 (10th Cir. 1997), held only that stack emissions are not themselves CWA discharges, which the SAC does not contend.

The CAA does not displace the duties the SAC invokes. The defendants identify no Title V requirement that conflicts with the Facility Order's SWPPP, BMP, operation-and-maintenance, or reporting conditions or with RCRA's provisions on discarded solid waste. Overlap is not conflict. *Cf. Ecological Rts. Found.*, 874 F.3d at 1095 (RCRA's anti-duplication provision yields only to actual inconsistency).[41] The Title V permit, which the court notices for its terms, regulates emissions. It does not authorize MRC to leave deposited solids in its stormwater conveyances or excuse compliance with its water permit.

The defendants are right that the court cannot regulate air emissions under the CWA, and the SAC's prayer for source controls on emission-generating equipment reaches beyond the permit conditions the claims enforce. EDEN disclaims any request that the court set an air-emission limit.[42] Any injunction will be tailored to the violations proved, *see* Fed. R. Civ. P. 54(c), and it will not extend to the flare, the CO boilers, or the Title V permit. But the scope of a prayer is not a ground for dismissing a claim under Rule 12(b)(6). Whether the SAC plausibly links the 2022

---

[41] The court considers this case, which the plaintiff cites, for the general point that overlap is not displacement; it construes 42 U.S.C. § 6905(a), which does not name the CAA.

[42] Opp'n – ECF No. 38 at 13–14; SAC – ECF No. 28 at 42–43 (Prayer, ¶¶ 4–7).

United States District Court
Northern District of California

release to any effluent-limit exceedance is a different question, addressed below under claim six. It is not an element of claim seven, which turns on what the permit requires MRC to do about particulate sources on its site.

**4. The Clean Water Act Claims**

The CWA prohibits the discharge of any pollutant from a point source to navigable waters except in compliance with a permit, 33 U.S.C. §§ 1311(a), 1342, 1362(12), and authorizes any citizen to sue a person "alleged to be in violation of . . . an effluent standard or limitation," which includes "a permit or condition of a permit" issued under the NPDES program. 33 U.S.C. § 1365(a)(1), (f)(7). Any condition of an NPDES permit (numeric, narrative, or procedural) is enforceable in a citizen suit. *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 834–36 (9th Cir. 2021); *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 916–18 (9th Cir. 2004). The court takes claim six first because the defendants' recurrence argument bears on the others.

**4.1 Claim Six: The Table 2 Effluent Limits and Recurrence**

The citizen-suit provision reaches persons "alleged to be in violation," which requires "that citizen-plaintiffs allege a state of either continuous or intermittent violation — that is, a reasonable likelihood that a past polluter will continue to pollute in the future." 33 U.SC. § 1365(a)(1); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987). Citizens may not sue for wholly past violations. *Gwaltney*, 484 U.S. at 64. A good-faith allegation of ongoing violation suffices for jurisdiction, *id.* at 64–65, but the allegation must still meet Rule 8's plausibility standard. In this circuit, a violation is ongoing if it continues after the complaint is filed or if there is "a continuing likelihood of a recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir. 1988) (cleaned up). Intermittent violations "do not cease to be ongoing until the date when there is no real likelihood of repetition." *Id.* (cleaned up); *Sw. Marine*, 236 F.3d at 998–99.

*Civil penalties.* The SAC's exceedance schedule lists TSS mass and nickel exceedances at Discharge Point 001 through July 2023, all of which the SAC itself annotates as resolved by Order

R2-2021-1007 or Order R2-2024-1041 and for which it disclaims penalties. The schedule's remaining entries compare TSS concentration readings to the Table 3 figures, which EDEN now concedes "set no limits" and are "not ceilings that can be exceeded."[43] Pre-2023 exceedances are pleaded as background only.[44] The SAC therefore alleges no exceedance for which a civil penalty is available, and the penalty claim under claim six fails on the pleadings. The plaintiff cannot preserve it by declining to "defend every row" of the schedule and offering to substitute a verified schedule later. A complaint is judged on what it alleges.[45]

*Injunctive relief.* The harder question is whether the SAC plausibly alleges that Table 2 violations are reasonably likely to recur. In the court's view it does not, for three reasons. First, the last alleged exceedance is in July 2023, sixteen months before the complaint and nearly three years before the SAC, and the SAC identifies no later monitoring result that violated or approached a Table 2 limit (although MRC's certified self-monitoring reports are public and EDEN evidently used them to build its schedule).[46] Second, the SAC's own disclaimers sever the link between the only pleaded source condition and the only pleaded limits: it disclaims any allegation that the 2022 release or any later aerial release caused any Discharge Point 001 exceedance, and it pleads no facts showing how residual solids on facility surfaces and in the stormwater conveyances would produce an exceedance at the treated-process-wastewater outfall.[47] Third, what remains — that MRC discharged "under recurring conditions showing a reasonable likelihood of future violations" — is a recital of the *Gwaltney* standard, not a fact.[48] Past violations can support an inference of recurrence, but the inference weakens with time and with the absence of any allegation that the treatment problems behind the 2023 exceedances persist. *Cf. Sierra Club*, 853

---

[43] SAC – ECF No. 28 at 4–5 (¶ 3), 23–24 (¶¶ 79–80); Opp'n – ECF No. 38 at 20; Reply – ECF No. 40 at 9–11.

[44] SAC – ECF No. 28 at 5 (¶ 5).

[45] Opp'n – ECF No. 38 at 20; Reply – ECF No. 40 at 11.

[46] Reply – ECF No. 40 at 12 & n.9. The court does not rely on the defendants' representation that there have been no exceedances since July 2023, which is outside the record.

[47] SAC – ECF No. 28 at 12 (¶ 36), 29–30 (¶¶ 96–97).

[48] *Id.* at 40 (¶ 144).

United States District Court
Northern District of California

F.2d at 671. The court dismisses claim six with leave to amend. EDEN has said it can plead a verified exceedance schedule; if it has Table 2 results after July 2023, or facts showing that the treatment or source conditions that produced the 2023 exceedances continue, it should plead them.[49]

### 4.2 Claim Seven: The Attachment S Stormwater Duties

Claim seven alleges that MRC violated the Attachment S requirements that the Facility Order makes enforceable as narrative effluent limitations: to (1) identify and evaluate all pollutant sources that may affect stormwater quality, (2) describe particulate-source locations, (3) assess material quantity, stormwater exposure, and direct and indirect pathways, (4) implement feasible housekeeping, cleanup, and containment measures, (5) conduct and record observations, (6) revise BMPs when observations show that sources are inadequately addressed, and (7) revise the SWPPP when necessary.[50] The SAC alleges that catalyst and coke solids were deposited on facility surfaces and in stormwater conveyances in November 2022, that residual solids remained after the Facility Order took effect and after the updated SWPPP came due in October 2023, that runoff showed visible discoloration and suspended solids in January 2023 and February 2024, and that MRC's SWPPP and BMPs do not identify, assess, inspect, clean, or control those solids as a recurring particulate source.[51]

---

[49] This is a close question, and this is the alternative argument. *Gwaltney* asks for a good-faith allegation of intermittent violation, and intermittent violations remain ongoing until there is no real likelihood of repetition. 484 U.S. at 64–65; *Sierra Club*, 853 F.2d at 671. The SAC alleges twenty-five effluent-limit exceedances across four periods in the eighteen months before suit, an unresolved treatment problem, and an exposed, uncharacterized source of TSS- and metal-bearing solids on the site. Those facts might be seen as permitting a plausible inference that the same limits are reasonably likely to be violated again. Whether the corrective actions recited in Order R2-2024-1041 eliminated that likelihood is a fact question that the court arguably cannot resolve on judicially noticed records, which are not noticed for the truth of their recitals. *Khoja*, 899 F.3d at 999. If the court had followed this approach, it would deny the motion as to claim six's claim for injunctive and declaratory relief and dismiss the penalty claim for the reasons stated above. Part 4.3 (claims one through three would not lose the Table 2 theory).

[50] Facility Order, Ex. 1 to Durando Decl. – ECF No. 34-2 at 18 (§ 6.3.4.3), 146–54 (Attachment S §§ 1.1, 1.4.3, 1.5–1.6, 1.9, 2.1–2.4); SAC – ECF No. 28 at 30 (¶ 100), 33–34 (¶¶ 113–15), 40–41 (¶¶ 145–47).

[51] SAC – ECF No. 28 at 5 (¶ 5), 19–20 (¶ 68), 27 (¶ 92), 29–30 (¶¶ 95, 98, 100), 33–34 (¶¶ 113–17), 35 (¶ 122), 40–41 (¶¶ 145–47).

That states a claim. The allegations track specific permit provisions that prescribe conduct, not end results, so they fall on the enforceable side of the line drawn in *City & County of San Francisco v. EPA*, 604 U.S. 334, 346–47 (2025). The defendants' response — that the SAC does not plausibly allege that air emissions caused any permit exceedance — misunderstands the claim. Attachment S does not require an exceedance. It requires MRC to find, document, and control particulate sources on its site before they reach the outfalls. Twenty tons of metal-bearing catalyst on the ground and in the storm drains is such a source, however it got there, and whether MRC's SWPPP adequately addressed it is a question of fact. The defendants' assertion that MRC updated its SWPPP in 2025 is outside the record.[52] Nor does it matter that the claim's caption cites the Table S-1 action-level provision (§ 1.7): the count incorporates the allegations identifying the broader Attachment S duties, EDEN disclaims any theory that the action levels are effluent limits, and a complaint need not plead the correct legal label. *Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per curiam). The motion is denied as to claim seven.

**4.3 Claims One Through Three**

Claim one alleges a violation of the duty to comply with the permit (Attachment D § 1.1.1). EDEN concedes that it is derivative: it survives to the extent an underlying permit violation survives and adds nothing independent.[53]

Claim two (the duty to take reasonable steps to minimize or prevent a violative discharge, § 1.3) and claim three (the duty to properly operate and maintain systems of treatment and control, § 1.4) are pleaded on two theories: (1) recurring Table 2 exceedances, and (2) residual solids in the stormwater conveyances, inadequate source characterization and cleanup, and deficient stormwater controls.[54] The first theory falls with claim six. The second is plausibly pleaded for the reasons given for claim seven: the defendants concede that § 1.4 is enforceable independent of a numeric exceedance, the SAC identifies the systems (the stormwater conveyances and controls

[52] Reply – ECF No. 40 at 13.

[53] Opp'n – ECF No. 38 at 17.

[54] SAC – ECF No. 28 at 19–20 (¶¶ 68), 30 (¶ 100), 33–34 (¶¶ 113–15), 36–38 (¶¶ 126, 129, 132–135); Opp'n – ECF No. 38 at 17–18.

used for NPDES compliance) and the failure (leaving deposited solids in them and not maintaining controls adequate to the source), and EDEN limits claim three to systems used for NPDES compliance rather than to every refinery process or air-control device.[55] The court holds EDEN to that limitation. The motion is denied as to claims two and three on the stormwater-source theory and granted, with leave to amend, to the extent those claims rest on recurring Table 2 exceedances.

**4.4 Claim Four: Bypass**

The Facility Order prohibits bypass — the "intentional diversion of waste streams from any portion of a treatment facility" — except as Attachment D § 1.7 allows.[56] The SAC alleges no diversion: no date, no treatment unit, no waste stream, no routing. EDEN's response is to say what claim four does not allege (that flaring is a bypass) and to ask for leave to plead "the specific diversion events" if event-level detail is required.[57] Rule 8 permits alternative pleading, but it does not permit a claim with no facts. Claim four is dismissed with leave to amend.

**4.5 Claim Five: Reporting**

Attachment D requires 24-hour and five-day reports of noncompliance that may endanger health or the environment, 24-hour reports of qualifying bypasses and upsets, advance notice of planned changes that may result in noncompliance, and reporting of other noncompliance with monitoring reports.[58] Reporting conditions are independently enforceable, and a suit to enforce them need not rest on an ongoing discharge violation. *Inland Empire Waterkeeper*, 17 F.4th at 835–36. But each duty is triggered by an event — a reportable noncompliance, a bypass or upset, a planned change — and the SAC identifies none. It alleges that MRC knew or should have known of "anticipated events," "treatment-system constraints," "storm conditions," and "operational upsets" that "could result" in noncompliance and did not give timely notice.[59] That

---

[55] Reply – ECF No. 40 at 14; Opp'n – ECF No. 38 at 18.

[56] Facility Order, Ex. 1 to Durando Decl. – ECF No. 34-2 at 6 (§ 3.3), 35 (Attachment D § 1.7.1.1).

[57] Opp'n – ECF No. 38 at 18–19.

[58] Facility Order, Ex. 1 to Durando Decl. – ECF No. 34-2 at 42–43 (Attachment D §§ 5.5, 5.7–5.8).

[59] SAC – ECF No. 28 at 23 (¶ 78), 39 (¶¶ 139–41); Reply – ECF No. 40 at 17.

does not identify a report that the permit required and MRC did not make. EDEN's concession that "the actual permit predicates control," and its offer to supply an "event-by-event reporting matrix," confirm that the predicates are not pleaded.[60] The allegations that MRC did not sample runoff after upset events go to the Attachment S observation and sampling duties enforced in claim seven, not to the Attachment D reporting duties. Claim five is dismissed with leave to amend.

### 4.6 The Basin Plan and California Toxics Rule Theories

EDEN concedes that it "asserts no freestanding CWA claim based solely on Basin Plan or California Toxics Rule criteria" and does not dispute that those criteria are not effluent limitations in the Facility Order.[61] To the extent the SAC alleges that exceedances of Basin Plan objectives or Toxics Rule criteria are themselves permit violations, those theories are dismissed.[62]

## 5. Claim Eight: RCRA

RCRA's citizen-suit provision authorizes suit against any person "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B); *Ctr. for Cmty. Action & Env't Just. v. BNSF Ry. Co.*, 764 F.3d 1019, 1023 (9th Cir. 2014). No permit or regulatory violation is required, and nonhazardous solid waste suffices. *Cal. River Watch v. City of Vacaville*, 39 F.4th 624, 629 (9th Cir. 2022). "Solid waste" means "discarded material," 42 U.S.C. § 6903(27), and material is discarded when it is "disposed of, thrown away, or abandoned." *Safe Air*, 373 F.3d at 1041–42 (quoting *Am. Mining Cong. v. EPA*, 824 F.2d 1177, 1190 (D.C. Cir. 1987)). The defendants contend that the SAC pleads none of the elements. The court addresses the three grounds together because they turn on the same characterization of the claim.

---

[60] Opp'n – ECF No. 38 at 19.

[61] *Id.* at 21; Reply – ECF No. 40 at 16; *see City & County of S.F.*, 604 U.S. at 835–36.

[62] SAC – ECF No. 28 at 15–17 (¶¶ 47–56, 60), 35 (¶ 120).

*Handling and transportation. BNSF* held that emitting diesel particulate into the air is not "disposal" of solid waste, because disposal means placing waste "into or on any land or water," and particulate that is "first emitted into the air" is not so placed even if it later settles. 764 F.3d at 1024–25. The court expressly did not decide whether emissions could constitute "handling," "storage," or "transportation," because the plaintiffs had not pleaded those theories. *Id.* at 1023 n.4. EDEN accepts *BNSF* and pleads around it. The RCRA claim rests not on the passage of catalyst through the exhaust train but on what happened afterward: MRC's response crews collected, handled, and hauled the deposited material, and MRC left residual solids in its conveyances, soils, and sediments.[63] The defendants say that this relabels the same air-emission event. It does not. Collecting and hauling twenty tons of spent catalyst off the ground is handling and transportation of that material in the ordinary sense of those words, and it is active waste-management conduct of the kind *Vacaville* contrasted with the passive conveyance of contaminated groundwater. 39 F.4th at 632–33. That MRC's conduct was a cleanup does not take it outside the statute, which reaches "past or present" handling; what matters is whether the waste that was handled, and the residue left behind, "may present" an endangerment now. *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485–86 (1996). MRC's control over the materials, the site, and the crews satisfies "contribution" at the pleading stage. *Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850–52 (9th Cir. 2011). *Steward v. Honeywell Int'l, Inc.*, 469 F. Supp. 3d 872, 880–81 (S.D. Ill. 2020), which declined to treat particulate in exhaust that settled around a plant as solid waste, is not binding and involved no allegation of post-deposition collection and hauling. The court cannot say as a matter of law that *BNSF*'s reasoning about "disposal" extends to conduct that begins after the material has come to rest on land.

*Solid waste.* EDEN concedes that catalyst and coke are not waste while they are contained and managed as products or in-process materials.[64] It alleges that the material that escaped containment landed on the ground and in the storm drains, ceased to serve any refinery purpose,

[63] *Id.* at 19–20 (¶ 68), 35–36 (¶¶ 122–26), 41 (¶ 150); Opp'n – ECF No. 38 at 21–22.

[64] SAC – ECF No. 28 at 19 (¶ 66).

was left to accumulate and migrate, and was abandoned. Material abandoned on the ground is discarded. *Safe Air*, 373 F.3d at 1041–42; *cf. Am. Mining Cong.*, 824 F.2d at 1185–86 (in-process materials destined for immediate reuse are not discarded). That is plausibly pleaded.

*Imminent and substantial endangerment.* An endangerment is "imminent" if it "threaten[s] to occur immediately," and the statute's reference to waste that "may present" such a threat "quite clearly excludes waste that no longer presents such a danger." *Meghrig*, 516 U.S. at 485–86. The threat must be present, though the harm may be latent; "substantial" means serious. *Id.*; *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994). The SAC alleges that (1) residual catalyst and coke solids containing elevated aluminum, barium, chromium, nickel, vanadium, and zinc remained at filing on facility surfaces, in stormwater conveyances, and in surrounding soils and sediments, (2) they are exposed to rain, wind, washdown, and tracking, (3) they migrate and are remobilized into stormwater and the receiving waters, and (4) MRC has not characterized, delineated, contained, or removed them.[65] Those allegations describe an existing waste condition and present transport pathways, not a historical release. The passage of time since November 2022 and the cleanup that followed cut toward the defendants, and *Meghrig* excludes waste that no longer presents a danger; but whether residual solids remain is a question of fact, and the SAC alleges that they do. EDEN's request that MRC characterize the material is a remedy, not a concession that no endangerment exists. The motion is denied as to claim eight.[66]

---

[65] *Id.* at 19–20 (¶¶ 68), 30 (¶ 98), 35–36 (¶¶ 122–23, 126).

[66] This too is a close question, and this is the alternative argument. Even accepting that post-deposition handling is not foreclosed by *BNSF*, the SAC arguably does not plausibly allege a present, imminent, and substantial endangerment. The release occurred in November 2022, and MRC's crews collected and hauled the deposited material. What the SAC adds is that unspecified "residual" material remains "somewhere" on facility surfaces, in conveyances, soils, or sediments, and "may be" remobilized. It alleges no sampling result, no concentration, no location, and no pathway from a location where residual solids are alleged to exist to a receptor, and it asks the court to order MRC to investigate whether the condition it alleges exists. *See Meghrig*, 516 U.S. at 485–86; *cf. Eagle Star Rock Prods. LLC v. PCC Structurals, Inc.*, 756 F. Supp. 3d 1062, 1084 (D. Or. 2024). Those arguably are conclusions, not facts, and nearly four years after the release, they arguably do not permit a plausible inference of a threat that "threatens to occur immediately." If this argument had persuaded, claim eight would be dismissed with leave to amend to plead facts (sampling, observed deposits, or otherwise) showing where residual catalyst or coke solids remain and how they presently threaten health or the environment.

United States District Court
Northern District of California

**6. Claim Nine: The Unfair Competition Law**

The UCL's unlawful prong "borrows" violations of other laws and treats them as independently actionable. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). A UCL claim predicated on a statute that provides no private right of action is permitted unless the predicate statute "actually bar[s]" the action or expressly permits the conduct. *Rose v. Bank of Am., N.A.*, 57 Cal. 4th 390, 396–98 (2013); *Cel-Tech*, 20 Cal. 4th at 182–84; *cf. Zhang v. Superior Ct.*, 57 Cal. 4th 364, 369 (2013) (a plaintiff may not use the UCL to plead around an absolute bar). Claim nine pleads three predicates: the CWA, RCRA, and Fish and Game Code § 5650.[67]

The CWA and RCRA predicates survive to the extent claims two, three, seven, and eight survive, and the defendants' derivative argument therefore fails. The § 5650 predicate survives too. Section 5650.1(d)(1) provides that "[e]very civil action brought under this section shall be brought by the Attorney General, district attorney, or city attorney in the name of the people of the State of California." "This section" is § 5650.1, the civil-penalty provision; the subsection allocates penalty enforcement to public prosecutors and says nothing about whether the substantive prohibition in § 5650 may serve as a UCL predicate for injunctive relief. That is the situation *Rose* addresses: the absence of a private right of action is not an absolute bar. *Rose*, 57 Cal. 4th at 397–98. The defendants cite *Russo v. M/T DUBAI STAR*, No. C 09-05158 SI, 2010 WL 1753187, at *3 (N.D. Cal. Apr. 29, 2010), which dismissed a claim predicated on the Fish and Game Code. That decision predates *Rose*, and to the extent it rests on the absence of a private right of action alone, the court does not follow it. Nor can the § 5650(b) exemption for discharges "expressly authorized pursuant to, and in compliance with," an NPDES permit be applied on the pleadings: the conduct alleged is placing catalyst and coke solids on land and in conveyances where they can pass into state waters, and no permit is alleged to authorize that. The People's own complaint alleged the same § 5650 theory against MRC.[68]

---

[67] SAC – ECF No. 28 at 42 (¶ 153).

[68] Compl., Ex. C to RJN – ECF No. 34-10 at 8 (¶ 34).

United States District Court
Northern District of California

The defendants' footnote suggestion that the People's judgment bars the § 5650 predicate is not developed and is denied without prejudice. A stipulated judgment binds its parties and those in privity with them; the defendants do not explain how EDEN, a nonparty, falls within any recognized exception to the rule against nonparty preclusion. *Taylor v. Sturgell*, 553 U.S. 880, 892–95 (2008);[69] *see* Final Judgment, Ex. E to RJN – ECF No. 34-12 at 9 (¶ 28) (limiting preclusive effect to the District Attorney and the Air District).[70]

EDEN did not respond to the defendants' argument that the SAC does not state a claim under the unfair prong and says that the theory is unnecessary. The unfair-prong theory is dismissed as abandoned. The motion is otherwise denied as to claim nine.

**7. The Prior-Prosecution Bar**

The CWA provides that a violation "shall not be the subject of a civil penalty action" under § 1365 if a State "has commenced and is diligently prosecuting an action under a State law comparable to" § 1319(g) or has issued a final order under such a law and the violator has paid the penalty. 33 U.S.C. § 1319(g)(6)(A)(ii)–(iii). A comparable state law must provide for penalty assessment and public participation, and a penalty must actually have been assessed. *Knee Deep Cattle Co. v. Bindana Inv. Co.*, 94 F.3d 514, 516 (9th Cir. 1996); *Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc.*, 728 F.3d 868, 877 (9th Cir. 2013). The bar reaches civil penalties only; it does not bar claims for declaratory or injunctive relief. 33 U.S.C. § 1319(g)(6)(A)(ii)–(iii).

[69] EDEN's statement of recent decision cites *Washington v. Crown Resources Corp.*, No. 25-2397, slip op. at 9–18 (9th Cir. Sept. 28, 2026), which held that a CWA consent decree entered in one citizen suit did not preclude a nonparty's claims absent privity and that the CWA's only express foreclosure of successive litigation by nonlitigants is the statutory bars in §§ 1365(b)(1)(B) and 1319(g)(6)(A). ECF No. 43. The decision is consistent with the analysis here. The preclusive effect of the People's state-court judgment would be governed by California law, 28 U.S.C. § 1738, but the defendants have not developed the point under either body of law.

[70] Mot. – ECF No. 34 at 28 n.32 (attributing the action to the Attorney General; it was brought by the District Attorney and the Air District); Reply – ECF No. 40 at 17 n.13. The plaintiff also cites *Villarroel v. Recology, Inc.*, 97 Cal. App. 5th 762, 782–85 (2023), for the proposition that a public prosecutor's UCL judgment does not bind private plaintiffs absent privity. The court does not reach the point.

The Water Board's two orders assessed penalties under Water Code § 13385 for the violations they enumerate, and EDEN does not seek penalties for those violations.[71] The motion is granted to that undisputed extent: civil penalties are barred for the violations enumerated in Orders R2-2021-1007 and R2-2024-1041. It is otherwise denied. The bar does not reach injunctive relief, and the People's judgment does not trigger it: that was a court action, not an administrative proceeding under § 1319(g)(6)(A)(ii), and it enforced air-quality, Fish and Game Code, and UCL provisions, not a law comparable to the CWA's effluent-limitation scheme. *Chico Scrap Metal*, 728 F.3d at 877 & n.8. For the same reason, it is not an action "to require compliance with the standard, limitation, or order" that would bar suit under § 1365(b)(1)(B). The defendants' observation that the prior settlements also required corrective measures may bear on the tailoring of any injunction; it is not a ground for dismissal.[72]

**8. Pre-Suit Notice**

A CWA plaintiff must give notice of the alleged violation to the violator, the EPA, and the State at least sixty days before suing, and a RCRA endangerment plaintiff must give ninety days' notice. 33 U.S.C. § 1365(b)(1)(A); 42 U.S.C. § 6972(b)(2)(A). The requirement is mandatory. *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989); *Wash. Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir. 1995). A notice must include enough information "to permit the recipient to identify" the standard violated, the activity alleged to violate it, the responsible person, the location, and the dates, 40 C.F.R. § 135.3(a); it is judged functionally, not technically. *Tosco*, 309 F.3d at 1158; *Waterkeepers N. Cal.*, 375 F.3d at 917–18; *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 953 (9th Cir. 2002) (notice need not list every later violation of the same type from the same source).

[71] SAC– ECF No. 28 at 4–5 (¶ 3), 23–25 (¶¶ 79–80); Opp'n – ECF No. 38 at 26. In its limited opposition to the RJN, EDEN questions whether the Water Board's prosecution was "diligent," Pl.'s Limited Opp'n to RJN – ECF No. 39 at 4, 13; that position is inconsistent with the SAC and the opposition, and the court disregards it.

[72] Mot. – ECF No. 34 at 29–30.

The motion attacks only the July 7, 2026 letter, served a week after the SAC.[73] But the SAC pleads, and the record contains, a June 10, 2024 notice served 152 days before the complaint and a July 30, 2025 supplemental notice served more than ninety days before the amended pleadings, and the opposition maps those notices to each claim: the Facility Order provisions and Attachment S, the Discharge Point 001 exceedances by date, the November 2022 release and the deposited solids, and the RCRA endangerment theory.[74] The motion does not engage with those notices. The reply's new argument — that the allegation about "response crews" appears in neither earlier notice — was raised for the first time in reply and is not considered. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). It would fail in any event. A notice identifies the activity, standard, and location. It need not recite every fact later pleaded, and a notice identifying the November 2022 release, the deposited solids, and their mobilization by stormwater gave MRC what it needed to identify and correct the problem. The notices' use of "Martinez Refinery Company, LLC" rather than "Martinez Refining Company LLC" is a misnomer that identified the facility, permit, and operator without ambiguity, and the defendants do not contend otherwise. The motion is denied on this ground. If EDEN amends, any new claim must have been the subject of a compliant notice.

### 9. The PBF Entities

A parent or affiliate is liable for its own conduct, not its subsidiary's, and it is liable as an "operator" of a polluting facility only if it "manage[s], direct[s], or conduct[s] operations specifically related to pollution." *United States v. Bestfoods*, 524 U.S. 51, 64–68 (1998). The SAC identifies MRC as the owner and operator of the refinery. Its allegation that PBF Energy Western Region LLC "exercised, directed, or retained operational control over" the refinery's operations, maintenance, stormwater controls, waste handling, and environmental-compliance decisions is a recital of the *Bestfoods* standard with no supporting fact: no person, decision, document, or event. And its allegation that PBF Energy Limited is liable "only to the extent" it exercised comparable

[73] *Id.* at 34.

[74] SAC – ECF No. 28 at 4–5 (¶¶ 2–3), 8 (¶ 19); Suppl. Sanchez Decl. – ECF No. 38-1 at 2 (¶¶ 3–4) & 4–56 (Exs. 1–2); Opp'n – ECF No. 38 at 27–29.

control is not an allegation of fact at all.[75] Information-and-belief pleading is permitted where the facts are peculiarly within the defendant's possession, but the plaintiff must still plead facts that make the inference plausible. *Soo Park v. Thompson*, 851 F.3d 910, 928–29 (9th Cir. 2017). There are none here. The confusion about which PBF entity EDEN means to sue — PBF Energy Limited, a British Columbia subsidiary, or PBF Energy Inc., the Delaware parent headquartered in New Jersey — compounds the problem.[76] The claims against both PBF entities are dismissed with leave to amend. Any amendment must name the correct entity and plead facts about what that entity did.

**10. Service of Process**

The defendants moved under Rule 12(b)(4), contending that EDEN served an unsigned summons and the original complaint rather than the SAC. After the motion was filed, EDEN served a signed summons and the SAC on each defendant's registered agent and filed proofs of service. The reply does not contest that service or press the argument.[77] The defendants have appeared, stipulated to the SAC and to the briefing schedule, and litigated the merits, and they identify no prejudice. Rule 4(m) gives the court discretion to extend the time for service even without good cause. *Efaw v. Williams*, 473 F.3d 1038, 1041 (9th Cir. 2007); *In re Sheehan*, 253 F.3d 507, 512–13 (9th Cir. 2001). The court extends the deadline to September 3, 2026, and denies the motion on this ground.

**11. Leave to Amend**

Leave to amend should be freely given, and dismissal without leave is proper only when amendment would be futile. Fed. R. Civ. P. 15(a)(2); *Lopez*, 203 F.3d at 1130. The defendants ask for dismissal with prejudice because EDEN has amended twice. But the SAC was EDEN's

---

[75] SAC – ECF No. 28 at 7–9 (¶¶ 15–16, 20).

[76] Mot. – ECF No. 34 at 12 n.5, 33 n.35; PBF Energy, Inc. Form 10-K, Ex. I to RJN – ECF No. 34-16 at 6.

[77] Proofs of Service – ECF No. 37; Reply – ECF No. 40 (no discussion).

response to the defendants' first motion, no court has previously identified the deficiencies, and the deficiencies in claims four, five, and six and in the claims against the PBF entities are the kind that facts could cure. EDEN may file a third amended complaint within fourteen days. It may not add new claims or parties without leave.

**CONCLUSION**

The court grants in part and denies in part the motion to dismiss, as follows.

1. The request for judicial notice is granted as to the existence, dates, parties, terms, and legal effect of RJN Exhibits A through I and Durango Declaration Exhibits 1 and 2, and denied to the extent the defendants offer the exhibits for the truth of disputed statements in them. The court does not consider Exhibits A and B to the reply.

2. The motion is denied as to standing.

3. The motion is denied to the extent it contends that the CWA and RCRA claims are air-emissions claims that must be brought under the CAA.

4. Claim six is dismissed with leave to amend. Claims four and five are dismissed with leave to amend. Claims one, two, and three are dismissed with leave to amend to the extent they rest on recurring Table 2 effluent-limit exceedances and otherwise survive. Claim seven survives. Any theory that an exceedance of Basin Plan objectives or California Toxics Rule criteria is itself a permit violation is dismissed.

5. The motion is denied as to claim eight.

6. Claim nine survives under the unlawful prong. The unfair-prong theory is dismissed as abandoned.

7. Civil penalties are barred under 33 U.S.C. § 1319(g)(6) for the violations enumerated in Water Board Orders R2-2021-1007 and R2-2024-1041. The motion is otherwise denied on this ground.

8. The motion is denied on the ground of insufficient pre-suit notice.

9. The claims against PBF Energy Limited and PBF Energy Western Region LLC are dismissed with leave to amend.

United States District Court
Northern District of California

10. The motion is denied on the ground of insufficient process or service; the time for service is extended to September 3, 2026.

11. The plaintiff's administrative motion for leave to file a sur-reply (ECF No. 41) is denied as moot, and its objections to the reply evidence (ECF No. 42) are overruled as moot.

The plaintiff may file a third amended complaint within fourteen days of this order. It may not add new claims or parties without leave of court. It must attach a blackline compare of any amended complaint against the current complaint. If the plaintiff does not amend, the defendants must answer the surviving claims within fourteen days after the amendment deadline. *See* Fed. R. Civ. P. 12(a)(4)(A).

This resolves ECF Nos. 34 and 41.

**IT IS SO ORDERED.**

Dated: October 7, 2026

LAUREL BEELER
United States Magistrate Judge